UNITED STATES of America, Plaintiff,

v.

TITLE INSURANCE RATING BUREAU OF ARIZONA, INC., Defendant.

In re ARIZONA ESCROW FEE ANTITRUST LITIGATION.

STATE of Arizona, et al., Plaintiffs,

v.

TITLE INSURANCE RATING BUREAU OF ARIZONA, INC., et al., Defendants.

Eric and Leslie VAUGHN, Plaintiffs,

v.

TITLE INSURANCE RATING BUREAU OF ARIZONA, INC., et al., Defendants.

Dwight C. LUNDELL, Plaintiff,

v.

TITLE INSURANCE RATING BUREAU OF ARIZONA, INC., et al., Defendants.

Nos. CIV 80–769 PHX CAM, CIV 80–840A PHX CAM, CIV 80–996 PHX CAM, CIV 80–840 PHX CAM and CIV 80–885 PHX CAM.

United States District Court, D. Arizona.

June 23, 1981.

Gordon L. Lang, David A. Blotner, Antitrust Division, U. S. Dept. of Justice, Washington, D. C., for United States.

Josef D. Cooper, Tracy R. Kirkham, Douglas A. Marshall, Law Offices of Josef D. Cooper, P. C., San Francisco, Cal., Arthur J. Davich, Ted Wright, Davich & Pollock, Phoenix, Ariz., for plaintiffs Eric and Leslie Vaughan, Civ. A. No. 80–840 PHX CAM.

J. Michael Hennigan, Roderick G. Dorman, Bretz & Hennigan, Beverly Hills, Cal., Paul G. Rees, Jr., Tucson, Ariz., for plaintiff Dwight C. Lundell, Civ. A. No. 80–885 PHX CAM.

Alison B. Swan, Chief Counsel, Mark Freitag, Asst. Atty. Gen., Antitrust Division, Phoenix, Ariz., Timothy Hogan, Asst. Atty. Gen., Financial Fraud Division, Phoenix, Ariz., Kenneth R. Reed, Sp. Asst. Atty. Gen., Law Offices of Kenneth R. Reed, Phoenix, Ariz., for J. Michael Low, Director of Insurance, State of Arizona.

J. Thomas Hannan, Ronald Lovitt, Lovitt & Hannan, Inc., San Francisco, Cal., for Lundell.

David L. White, Jennings, Strouss & Salmon, Phoenix, Ariz., for U. S. Life Title Ins. Co., Dallas, and defendants' Liaison Counsel.

Aaron Rosen, Associate Gen. Counsel, TICOR, Los Angeles, Cal., John A. Baade, Miller, Pitt & Feldman, Tucson, Ariz., for Pioneer National Title Ins. Co.

Philip P. Berelson, Brown & Bain, P.A., Phoenix, Ariz., for Title Ins. Rating Bureau of Arizona, and First American Title Ins. Co. of Arizona.

Kimball Corson, Lewis & Roca, Phoenix, Ariz., for Transamerica Title Ins. Co.

Phil Horvitz, Asst. Counsel, Commonwealth Land Title Ins. Co., Philadelphia, Pa., Daniel Cracchiolo, Burch & Cracchiolo, Phoenix, Ariz., Rick Klaren, Commonwealth Land Title Ins. Co., Beverly Hills, Cal., for Commonwealth Land Title Ins. Co.

Leon R. Goodrich, Oppenheimer, Wolff, Foster, Shepard & Donnelly, St. Paul, Minn., Gerard K. Knorr, Gen. Counsel, St. Paul Title Ins. Corp., St. Paul, Minn., for St. Paul Title Ins. Corp.

Russell E. Jones, Michael J. Meehan, Molloy, Jones, Donahue, Trachta, Childers & Mallamo, Tucson, Ariz., Paul J. Kennedy, Executive Vice President and House Counsel, Stewart Title & Trust of Phoenix, Phoe-

nix, Ariz., William R. Pakalka, Fulbright & Jaworski, Houston, Tex., for Stewart Title Guaranty Co.

Edward B. Towey, Law Offices of Towey & Zak, Denver, Colo., for Title Ins. Co. of Minnesota.

John F. Graybeal, Foley, Lardner, Hollabaugh & Jacobs, Washington, D. C., for Lawyers Title Ins. Corp.

M. E. Rake, Jr., O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, Phoenix, Ariz., for St. Paul Title Ins. Co., American Title Ins. Co., Chicago Title Ins. Co., and Lawyers' Title Ins. Co.

Martin R. Galbut, McLoone, Theobald & Galbut, P. C., Phoenix, Ariz., for Land Title Ass'n of Arizona.

Richard Q. Nye, Foley, Clark & Nye, Phoenix, Ariz., for Fidelity National Title.

Philip E. von Ammon, Fennemore, Craig, von Ammon, Udall, Phoenix, Ariz., for American Title Ins. Co.

John C. Christie, Jr., Bell, Boyd, Lloyd, Haddad & Burns, Washington, D. C., for Chicago Title Ins. Co.

J. Edd Stepp, Jr., Gibson, Dunn & Crutcher, Los Angeles, Cal., Dennis A. Berkey, Corporate Counsel, SAFECO Title Ins. Co., Panorama City, Cal., for SAFECO Title Ins. Co.

## OPINION AND ORDER.

MUECKE, Chief Judge.

The plaintiffs herein, the United States of America, the State of Arizona, and two private plaintiffs, seek a summary determination that defendants, a title insurance rating bureau and its individual members and subscribers, are guilty of price fixing as proscribed by Section 1 of the Sherman Act. 15 U.S.C. § 1.

In response, defendants have filed a Motion for Summary Judgment and a Motion to Dismiss, arguing that they are immune from antitrust liability. Defendants are of the position that they are engaged in the business of insurance and that their activities are regulated by the State of Arizona, bringing them within two of the traditional exemptions from the sweep of the Sherman Act. One defendant has submitted a Motion to Dismiss, asserting that theirs is protected Noerr-Pennington activity,[1] and it is therefore immune from antitrust liability.

The parties agree that there are no material issues of fact; they simply seek a judicial determination as to whether the defendants are within an exemption to the antitrust laws.

## BACKGROUND

In 1977 the Arizona Legislature passed House Bill 2316 requiring, *inter alia*, that title insurance companies file a schedule of rates for the escrow services they were performing. *See* A.R.S. § 20–376(A & B). The Director of Insurance was charged with the review and approval of such rates when satisfied that they served the public welfare. A.R.S. § 20–376(D), § 341. The legislation required that the filings be submitted within ninety (90) days of its date of effect, August 27, 1977.

Defendant Title Insurance Rating Bureau of Arizona, Inc., TIRBA, is a title insurance rating organization licensed under Arizona law. It has thirteen members and a greater number of subscribers, all of which are engaged in the business of title insurance.

As part of their services, most of the defendant insurance companies provide escrow services. In October and November, 1977, the TIRBA Board of Directors held a series of meetings at which escrow rates and services for the title insurers and their agents were discussed and classified. On November 9, 1977, the TIRBA Board of Directors approved the "Schedule of Escrow Services Rates, Manual of Classifications and Rules and Plans Relating Thereto" and authorized its submission to the Arizona Department of Insurance. On November 14, 1977, TIRBA delivered its Schedule to

---

1. *Eastern Railroad Presidents Conference v. Noerr Motor Freight Inc.*, 365 U.S. 127, 80 S.Ct. 862, 4 L.Ed.2d 866 (1961); and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

the Department as its initial filing of escrow rates. The schedule stated that it was filed "on behalf of members and subscribers to the services of said Rating Bureau." As per Arizona law, the filing became effective fifteen days after it was filed. A.R.S. § 20–376(E). Subsequently, in December, 1977 and January of 1978, TIRBA, on behalf of its members, filed amendments to its escrow rates, which amendments have been accepted by the Department. In April of 1978, TIRBA, again on behalf of its members and subscribers, submitted a correction of certain earlier filed rates and additional rates for certain services. In December of 1978, TIRBA filed a revised Schedule which recoded certain escrow classifications or rates.

The effect of these filings is that since at least 1977, a uniform price has been charged for escrow services by the title insurance companies in Arizona. Although authorized by A.R.S. § 20–379, none of the companies has filed deviations from the rating bureau schedule or chosen to subscribe to only some of the rating bureau's filings, but all of the companies have charged the same price for their services.

On September 23, 1980, the United States Department of Justice filed suit against TIRBA, alleging that the rating bureau and its members had engaged in an unlawful conspiracy in restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act. The complaint sought injunctive relief preventing the continuation of the conspiracy and cancelling the joint escrow rate filings.

On December 1, 1980, the State of Arizona, on its own behalf, as representative of governmental entities within the State that have purchased escrow services, and as *parens patriae* on behalf of all natural persons residing in the State who had purchased escrow services, filed a complaint similar to the one filed by the United States. In addition to praying for injunctive relief against TIRBA and its members, the complaint sought treble damages as provided by Section 4 of the Clayton Act. 15 U.S.C. § 15.

During October 1980, two private actions were filed by individual plaintiffs on their own behalf and as representatives of a class of all others similarly situated. These actions sought injunctive relief and treble damages. The private complaints also named the Arizona Director of Insurance as a defendant and sought to enjoin him from implementing any of the provisions of Arizona law which related to the setting, filing, posting or adherence to escrow rates by title insurers. The Director has subsequently been dismissed from the suits.

The defendants' answers have framed two defenses which they still maintain: first, that the complaint concerns activities constituting the business of insurance, a business exempted from the antitrust laws by the McCarran-Ferguson Act, 15 U.S.C. § 1011 *et seq.*; and second, that the defendants' activities were undertaken pursuant to a scheme of state regulation as required by state law.

On March 26, 1981, defendant Transamerica Title Insurance Company filed a Motion for Partial Judgment on the Pleadings which essentially raised a third defense: that the activities of the defendant companies in response to Arizona law could not be the basis for liability under the Sherman Act because the actions were protected expression and thereby insulated from liability by the Noerr-Pennington Doctrine.

### THE BUSINESS OF INSURANCE

Section 2(b) of the McCarran-Ferguson Act provides that the federal antitrust laws shall not be applicable to the business of insurance so long as that business is state regulated. 15 U.S.C. § 1012(b). In this case, there is no dispute that the insurance business is regulated by the State of Arizona. The issue in contention is whether escrow services constitute the business of insurance.

█ Although the State of Arizona has promulgated statutes which indicate that it considers escrow services to be the business of insurance, a state's determination is not conclusive. *SEC v. Variable Annuity Life*

*Insurance Co. of America*, 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959). The definition of "insurance" in the McCarran-Ferguson Act context is a federal question. *Id.* at 69, 79 S.Ct. at 620.

■ The standard-setting opinion in this area of the law is *Group Life and Health Insurance Company v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979). In that case, owners of independent pharmacies brought suit against Blue Shield insurance plan and owners of three pharmacies alleging that the defendants had fixed prices and formed an illegal group boycott by entering into agreements which set a formula for reimbursement on prescription drugs provided to Blue Shield policyholders.

In holding that the agreements were not within the McCarran Act exception, the Court distinguished between the "business of insurance" and the "business of insurers," stressing that the exception only applied to the former. In defining the parameters of the business of insurance, the Court found: (1) a key determinant in identifying such business is the spreading and underwriting of risk, as distinguished from mere cost minimization arrangements; and, (2) another significant aspect of such business relates to the contract between the insurer and the insured, as distinguished from arrangements between the insurer and third parties.

The *Royal Drug* Court noted that while the agreements with the pharmacies could reduce Blue Shield's costs and ultimately the expense to its policyholders, they were not the business of insurance since they did not involve any underwriting or cost-spreading, nor were they contracts between the insurer and the insured.

In the present case, the contract is between the insurer and the insured, leaving for analysis only whether escrow services underwrite or spread risks amongst the policyholders. The defendants contend that the performance of escrow services allows the agents to evaluate and minimize the risk of loss under a title insurance policy; they posit that risk evaluation is an integral part of the underwriting process.

Not unexpectedly, the plaintiffs assert that escrow services lack the indispensible characteristic of risk-spreading or underwriting. An escrow is defined as a transaction where something is delivered to a disinterested third party, who holds it until a specified event occurs or does not occur. *See* A.R.S. § 6–801(1). An escrow agent is a fiduciary who acts pursuant to the parties' instructions. The plaintiffs characterize the agent as a stakeholder performing ministerial functions.

The plaintiffs also point out that escrow services are performed not only by insurers, but also by lending institutions, lawyers and independent escrow companies. They emphasize that when a title insurance company performs escrow services, none of the fee therefore goes to the insurance principal; all is retained by the agent performing the service.

The distinct difference between insurance and escrow services is further evidenced by the fact that three of the defendants herein, Stewart Title, U.S. Life Title, and Safeco Title Insurance have stated that they operate in Arizona exclusively through agents and that they are not in the escrow business at all.

While the defendants have relied on three pre-*Royal Drug* cases,[2] the plaintiffs have cited a trilogy of post-*Royal Drug* cases from the Fifth Circuit: *Cochran v. Paco Inc.*, 606 F.2d 460 (5th Cir. 1979); *Perry v. Fidelity Union Life Insurance Co.*, 606 F.2d 468 (5th Cir. 1979); and *Cody v. Community Loan Corp. of Richmond County*, 606 F.2d 499 (5th Cir. 1979). Therein, the circuit court held that an insurance company's premium financing in connection with the sale of an insurance policy and credit sale of

**2.** *Commander Leasing Co. v. Transamerica Title Insurance Co.*, 477 F.2d 77 (10th Cir. 1973); *Schwartz v. Commonwealth Land Title Insurance Co.*, 374 F.Supp. 564 (E.D.Pa.1974); and *McIlhenny v. American Title Insurance Co.*, 418 F.Supp. 364 (E.D.Pa.1976), none of which consider the concept of underwriting or risk-spreading in their analysis of the business of insurance.

**1058**

insurance, were not the business of insurance within the meaning of the McCarran-Ferguson Act. In *Perry*, the Fifth Circuit noted that the appropriate focus is not upon the entity performing the activity, *i. e.*, the insurance company, but upon the nature of the activity itself. 606 F.2d at 470.[3]

Focusing on the activity, the *Royal Drug* opinion admonished:

There is an important distinction between risk underwriting and risk reduction. By reducing the total amount it must pay to policyholders, an insurer reduces its liability and therefore its risk. But unless there is some element of spreading risk more widely, there is no underwriting of risk. 440 U.S. 214–15, 99 S.Ct. 1074–1075.

Unquestionably, when the same entity performs both the escrow services and provides the title insurance, these respective duties are performed very closely in time. Nevertheless, they are distinctively different functions. While a company providing title insurance may reduce its costs by executing the accompanying escrow duties, there is not any actual underwriting or risk-spreading involved in the performance of the escrow duties.

■ Exemptions from the antitrust laws are to be narrowly construed. *Abbott Laboratories v. Portland Retail Druggist Association Inc.*, 425 U.S. 1, 96 S.Ct. 1305, 47 L.Ed.2d 537 (1976). Furthermore, the McCarran-Ferguson Act is to be narrowly construed in the face of valid federal regulatory interests. *SEC v. Republic National Life Insurances Co.*, 378 F.Supp. 430, 436 (S.D.N.Y.1974). In providing customers with escrow services title insurance companies do not underwrite or spread risks amongst their policy holders. As a consequence, escrow services are not the business of insurance and therefore not within the McCarran-Ferguson Act exemption from the antitrust laws.

**STATE ACTION**

■ The defendants have alternatively asserted that they are immune from antitrust liability under the doctrine of state action, as articulated by *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), and its progeny. In essence, the defendants assert that the State of Arizona, through the regulation of the Department of Insurance, has taken the escrow industry from the competitive marketplace and subjected it to state regulation, guaranteeing that the services and rates will be in the citizenry's best interest.

The defendants' argument, however, runs contrary to both the caselaw defining the scope of the state action exemption and the legislative history surrounding Arizona law regarding escrow services.

In *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), the Court announced the threshold requirement that the state must compel the challenged conduct before the doctrine will shield liability. The defendant takes the position that compulsion is no longer required in light of the Court's recent opinion in *California Retail Liquor Dealers v. Midcal Aluminum*, 445 U.S. 97, 100 S.Ct. 937 (1980). However, *Midcal* approvingly quotes *Goldfarb* in regards to the compulsion requirement. *Id.* at 104, 100 S.Ct. at 943. Furthermore, under the facts presented in *Midcal*, there was no reason to dwell on the necessity of compulsion.

Since the issues raised by a state or private party in invoking the state action defense are very different, the Supreme Court has recognized that the identity of the defendant is relevant in determining the extent of state action immunity. *See City of Lafayette v. Louisiana Power and Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978). In fact, the plurality in *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1131 (1976), questioned the

---

**3.** The plaintiffs have also directed the Court's attention to the very recent case of *Pireno v. New York State Chiropractic Assn.*, 650 F.2d 387 (2d Cir. 1981). Therein, the circuit court reversed the trial court in finding that a chiro-practic association's peer review system designed to assess the reasonableness of practitioners' fees on behalf of insurance companies was not "the business of insurance" in that it did not underwrite or spread risks.

right of a private defendant to invoke the defense at all.

Under the Court's reasoning in *Goldfarb* and *Cantor*, for private conduct to gain immunity from the antitrust laws based on a state action defense, the degree of government involvement must be such that the State compels, by statute or regulation, the private conduct. *Goldfarb*, 421 U.S. at 791, 95 S.Ct. at 2015. The State must dominate the decision-making so as to significantly diminish the private party's freedom of choice. *Cantor*, 428 U.S. at 593, 96 S.Ct. at 3119.

 The State of Arizona does not compel the title insurance companies to charge a uniform rate for escrow services. The State has not sought to take the escrow service business out of the competitive field and regulate it as, for example, a state monopoly. The 1977 escrow legislation adopted a policy in favor of competition. In three separate provisions the legislature provides that a title insurer has the choice of filing its own escrow rates or having its rates filed by a rating organization. A.R.S. §§ 20–375(A), 376(B) and 376(C). Rating bureaus and subscribers are guaranteed the right to file deviation rates and to subscribe to some, but not all, of the rates filed by a rating bureau. A.R.S. § 20–379. These rights "are provided so that competitive rates may inure to the benefit of the public." *Pacific Fire Rating Bureau v. Insurance Company of North America*, 83 Ariz. 369, 375, 321 P.2d 1030, 1034 (1958).

The fact that the legislature did not uniformly fix rates has been admitted by some of the individual defendants in discovery. Further, the history of the escrow legislation reveals that the legislature explicitly decided not to give title insurers and agents immunity from the state antitrust laws. Minutes of Meeting, Committee on Commerce, April 4, 1977. Additionally, Arizona law provides that:

> Nothing in this article is intended to prohibit or discourage reasonable competition, or to prohibit or encourage, except to the extent necessary to accomplish the purpose stated in this section, uniformity

in insurance rates, rating systems, rating plans or practices .... A.R.S. § 20–341.

Proponents of the legislation stressed the competitive features of the law in testimony before the legislature. The Department of Insurance testified that "regulation of rates will help competition." Minutes of Meeting, Senate Committee on Agriculture, Commerce, and Labor, April 28, 1977.

There is a presumption against implied exclusions from coverage under the antitrust laws. *Lafayette v. Louisiana Power, supra*, 435 U.S. at 399, 98 S.Ct. at 1129. Given the Court's findings that the Arizona legislature did not intend to replace competition with public regulation of escrow rates and that the regulatory scheme adopted does not compel the defendants to fix prices, the Court concludes that the defendants may not successfully interpose the state action defense between its conduct and antitrust liability.

## NOERR–PENNINGTON DOCTRINE

 Defendant Transamerica Title Insurance Company has filed a Motion for Judgment on the Pleadings which seeks to avoid liability by asserting that all of the defendants' conduct is protected expression and therefore insulated from liability by the Noerr-Pennington Doctrine.

*Eastern Railroad Presidents Conference v. Noerr Motor Freight Inc.*, 365 U.S. 127, 31 S.Ct. 523, 5 L.Ed.2d 464 (1961) and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) established the general rule that lobbying and other similar activities by businesspersons to obtain legislative and executive action does not violate the antitrust laws, even though such legislation is intended to eliminate competition or otherwise restrain trade. In essence, the Court has deemed the right to petition so important so as to subordinate considerations of competition when the two clash. Von Kalinowski, 7 *Antitrust Laws and Trade Regulation*, § 46.04, p. 46–35 and 36.

In this case the parties have conceded that any activity taken by the defendants

while preparing to and petitioning the legislature in connection with escrow legislation is protected and will not form the basis for any claim herein. The defendants, however, have also claimed that their rate filings with the Arizona Department of Insurance, their approval, and subsequent implementation, are activities protected under the *Noerr-Pennington* Doctrine.

This Court views the Doctrine as one which protects activities undertaken to modify or change the laws, whether laws were promulgated by the legislature or a regulatory agency. The defendants' attempt to shoehorn rate filings, which are required by law to be done, into a protected activity, misapprehends the caselaw and the underlying policy. The mere filing of something required by law does not in any way invoke the right to petition. The defendants' filing of its rates is not an attempt by an individual or entity to employ the democratic process in order to effectuate change; it is mere compliance with the law.

In *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1979), an anticompetitive regulation was written by a utility and approved by the regulatory commission. The defendant utility sought protection under the *Noerr-Pennington* Doctrine. The Court responded:

> Moreover, nothing in the *Noerr* opinion implies that the mere fact that a state regulatory agency may approve a proposal included in a tariff and thereby require that the proposal be implemented until a revised tariff is filed and approved, is a sufficient reason for conferring antitrust immunity on the proposed conduct.

The filing that the defendants engage in here with the Department of Insurance is no more protected expression than was that of the utility in *Cantor*. As there, the defendants' *Noerr-Pennington* defense must be rejected.

## CONCLUSION

With this litigation, the parties seek a judicial determination as to whether the defendants' activities fall within or without an exception to the antitrust laws. There are no material facts in controversy: escrow services have been available since at least 1977, only at a uniform price charged by all of the defendants. The plaintiffs have alleged that this is a manifestation of illegal price-fixing as proscribed by Section 1 of the Sherman Act.

The defendants have responded by alleging that their providing escrow services is part of the business of insurance and thereby immune from antitrust liability as provided by the McCarran-Ferguson Act. As escrow services do not underwrite or spread risk amongst all title insurance policyholders, such activity does not constitute the business of insurance. *Royal Drug, supra.*

The defendants have also alleged immunity on the ground that theirs is a state regulated industry and that they are exempt from antitrust proscriptions under the State Action doctrine. *Parker, supra.* The State's legislative scheme does not compel the private defendants' uniform rate filing. *Lafayette; Cantor, supra.* A review of the Arizona statutes, A.R.S. §§ 20–375 through 379, and the legislative history of the Arizona law regulating escrow services also reveals that the State had no intention of supplanting competition with a purported state regulation providing for fixed prices in the escrow services field.

Defendant Transamerica Title has also sought to insulate itself from antitrust liability by alleging that all of the defendants' activities in filing its proposed rates with the Department of Insurance, their approval and subsequent implementation constitutes expression entitled to protection under the *Noerr-Pennington* Doctrine. As this activity in no way seeks to change the existing law, but merely conforms to existing law, the right to petition is not implicated. The defendants' filing of their rates with a state regulatory agency is not sufficient for conferring antitrust immunity on the conduct. *Cantor, supra.*

The defendants have earlier in this litigation insisted that their activities were not interstate commerce and therefore, this Court was without jurisdiction. The record

reveals that the activities do constitute interstate commerce, and the defendants have conceded such in discovery and in stipulating to the facts necessary to this summary disposition.

At another juncture, the defendants suggested that price-fixing, as alleged in the plaintiffs' complaints, should not be considered a *per se* violation of the antitrust laws. They suggested that the court employ the rule of reason in evaluating defendants' activities. As such an assertion flies in the face of decades of legal thought and reasoning, such an argument cannot be accepted by this Court.

Based upon the foregoing,

IT IS ORDERED that the United States of America's Motion for Summary Judgment is granted, while the defendant, TIRBA's Countermotion for Summary Judgment is denied.

IT IS FURTHER ORDERED that the State of Arizona's Motion for Partial Summary Judgment is granted.

IT IS FURTHER ORDERED that plaintiffs Lundell and Vaughn's Motion for Partial Summary Judgment is granted.

IT IS FURTHER ORDERED that defendant Transamerica Title Insurance Company's Motion for Judgment on the Pleadings is denied.

IT IS FINALLY ORDERED that the plaintiffs, United States of America, State of Arizona and Lundell and Vaughn submit proposed forms of judgment in reference to this Opinion and Order.